**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MERLYN V. KNAPP and BEVERLY KNAPP, | |
| Plaintiffs, | Civil Action No. |
| v. | 3: 17 - CV - 2130 (CSH) |
| AMERICAN CRUISE LINES, INC., | |
| Defendant, | |
| v. | OCTOBER 23, 2018 |
| OTIS ELEVATOR COMPANY, | |
| Third-Party Defendant. | |

**RULING ON PLAINTIFFS' MOTION TO AMEND COMPLAINT [Doc. 21] AND THE PARTIES' JOINT MOTION TO STAY CASE PROCEEDINGS [Doc. 31]**

**HAIGHT, Senior District Judge:**

## I.  INTRODUCTION

Plaintiffs Merlyn Knapp and Beverly Knapp, husband and wife, bring this action for bodily injuries sustained by Merlyn while cruising aboard the paddle wheel riverboat QUEEN OF THE WEST ("QOW") on the Columbia River, departing from Portland, Oregon, on May 6, 2017, and returning to that same port on May 13, 2017.   Defendant American Cruise Lines, Inc. ("ACL") owned and operated the QOW.   The vessel, which had multiple decks, was equipped with an elevator, which transported passengers from one deck to another.   Third-Party Defendant Otis

Elevator Company ("Otis") installed and maintained the elevator.[1]

As set forth in the Complaint [Doc. 1], Plaintiffs allege that Merlyn Knapp, aged eighty-eight at the departure date of the cruise, suffered from diabetes and diabetic neuropathy of his legs and feet, which interfered with his ability to walk comfortably. Doc. 1, ¶ 14. Consequently, he rented a motorized scooter to take with him on the cruise to assist his movement around the QOW. *Id.*, ¶ 15. On May 8, 2017, while the QOW was docked at The Dalles, Oregon, a port on the Columbia River, the Knapps entered the vessel's elevator after lunch to go from the main deck to the fourth deck. *Id.*, ¶¶ 19-20. Merlyn Knapp drove his scooter onto the elevator. *Id.*, ¶ 20. According to the Complaint, the elevator was defective and failed to stop level with the landing on the fourth deck, instead overshooting the landing and stopping higher than its surface: a condition termed as "misleveling." *Id.*, ¶ 21. Merlyn, seated in his scooter and facing the back wall of the elevator, was unaware of the misleveling and backed his scooter out of the elevator to exit on the fourth deck. *Id.*, ¶¶ 24-25. Due to the misleveling, his scooter's "rear wheels dropped off the edge of the misleveled floor of the elevator," causing him to "fall backward, striking his head and neck against the fourth-floor deck and an immediately adjacent vertical door." *Id.*, ¶ 26. Merlyn sustained "severe, painful and permanent injuries," including, *inter alia*: "a severe shock to his nervous system" and "a severe flexion injury of his neck, with fractures of the C7 vertebra in his neck and the T1 vertebra in his upper back." *Id.,* ¶ 27. Alleging Merlyn's severe injuries and substantial money damages, Plaintiffs filed this action to recover from ACL.

In their original Complaint, Plaintiffs asserted three counts of state law claims against ACL:

---

[1] The Knapps initiated the present action in this Court by filing their Complaint against ACL on December 20, 2017. Doc. 1. Thereafter, ACL impleaded Otis by Third-Party Complaint on February 23, 2018. Doc. 7.

negligence, bystander emotional distress, and loss of consortium. These three claims sounded in tort but also arose under maritime law. For example, the Complaint included allegations against ACL for such maritime claims as "failing to maintain the vessel in accordance with applicable United States Coast Guard Regulations, including 46 C.F.R. Subchapter K," and "failing to provide a seaworthy vessel for carrying Mr. Knapp as a passenger for hire."[2] *See* Doc. 1, ¶¶ 33 (h) and (i).

On March 21, 2018, Plaintiffs filed a third-party complaint against defendant Otis based on that company's installation and maintenance of the allegedly defective elevator. As in their main Complaint against ACL, Plaintiffs asserted a negligence claim against Otis, alleging, *inter alia*, that Otis failed to maintain and properly service the elevator, failed to properly and timely inspect the elevator for reasonable safety, failed to repair the elevator and/or to cause ACL to make and purchase necessary repairs, and failed to warn Merlyn Knapp about the elevator's defective condition or to install a warning device regarding misleveling on the elevator. Doc. 14, ¶¶ 33(a)-(h).

In their Third-Party Complaint, as in their main Complaint against ACL, Plaintiffs also included two derivative claims against Otis on behalf of Beverly Knapp. The first claim was for "bystander emotional distress," stemming from the distress she suffered in witnessing her husband being injured, evacuated, transported and treated for his serious injuries. *Id.*, ¶¶ 36-38. The second count was for "loss of consortium" for the damage to Beverly's marriage, including a "loss of society, affection, comfort, care and support" of her husband Merlyn. *Id.*, ¶¶ 39-40.

Pending before the Court are two motions which will be addressed in this Ruling. The first is Plaintiffs' "Motion for Leave to Amend Complaint" [Doc. 21], in which Plaintiffs seek leave to

---

[2] Subchapter K of Chapter 46 of the Code of Federal Regulations pertains to "small passenger vessels carrying more than 150 passengers or with overnight accommodations for more than 49 passengers."

add three claims. First, Plaintiffs request leave to add a fourth count to allege that ACL was reckless in that it had actual knowledge that the elevator was worn out, defective, and subject to misleveling before Merlyn Knapp was injured and failed to either warn Plaintiffs or to repair the defect. Doc. 21, at 2. In addition, Plaintiffs request to add two "derivative counts" against ACL, the Fifth and Sixth Counts, seeking recovery for reckless "bystander emotional distress" and reckless "loss of consortium," respectively. Plaintiffs represent that they have acquired information to bring the proposed amendments from documents received during the initial discovery disclosures from Otis. Plaintiffs assert that they bring this motion "in good faith" and that justice requires permitting said amendments under Federal Rule of Civil Procedure 15(a)(2).

ACL opposes Plaintiffs' proposed amendments, arguing that the newly added claims would be "futile." Doc. 25, at 5. First, ACL claims that Plaintiffs will be unable to meet the standard necessary to plead that ACL was "reckless" in the Fourth Count. Moreover, ACL maintains that even if Plaintiffs could plead the necessary facts, they "have waived such claims in their contract with ACL" when they purchased their tickets for their trip aboard the QOW. *Id.*, at 5, 13. According to ACL, in that contract, Plaintiffs waived "all claims for consequential or punitive damages." *Id.,* at 13. In addition, ACL asserts that the derivative claims in the Fifth and Sixth Counts are duplicative of those brought in the Second and Third Counts. *Id.*, at 5 n.1.

In the second pending motion addressed by this Ruling, the parties jointly request a stay of the case proceedings to allow them to focus on participating in an upcoming, scheduled mediation of this matter. Doc. 31. As part of this motion, they ask the Court to reset each case deadline with an extension of 120 days. *Id.*, at 4.

The Court resolves Plaintiffs' motion to amend and the parties' motion to stay herein.

4

## II.  **DISCUSSION**

### A.  **Standard to Amend**

Pursuant to Rule 15(a), Fed. R. Civ. P.,  a plaintiff may amend his complaint once as a matter of course within twenty-one days after service of the complaint or within twenty-one days after service of a responsive pleading (*i.e.*,  answer or motion to dismiss) or of a Rule 12(b), (e), or (f) motion, whichever is earlier.  *See* Fed. R. Civ. P. 15(a)(1)(A) and (B).  Thereafter, a party may amend its pleading only by leave of court or written consent of the adverse party; and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).

In *Foman v. Davis*, 371 U.S. 178, 182 (1962), the United States Supreme Court articulated the relevant standard for a court to determine whether to grant a party's request to amend his or her pleading under Federal Civil Rule 15(a)(2).  In particular, the  *Foman* court stated: "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of the amendment, etc. – the leave sought should, as the rules require, be 'freely given.'"  371 U.S. at 182. "Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Id.*

"Where the amended portion of the complaint would fail to state a cause of action, however, the district court may deny the party's request to amend." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339 (2d Cir. 2000) (citing *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28,

42 (2d Cir.1979)).  Under such circumstances, the amendment would be futile.

The burden of proving futility rests on the party opposing the amendment. *Schaghticoke Tribal Nation v. Norton*, No. 3:06-CV-81(PCD), 2007 WL 867987, at *11 (D. Conn. March 19, 2007). "[I]n making this determination [regarding futility], the court should not consider the merits of a claim or defense on a motion to amend unless the amendment is clearly frivolous or legally insufficient on its face." *Id.* (quotation marks omitted).  *See also Zuppardi's Appizza, Inc. v. Tony Zuppardi's Appiza, LLC*, No. 3:10-CV-1363 (RNC), 2012 WL 1067652, at *1 (D. Conn. Mar. 30, 2012).

## B.  Plaintiff's Motion to Amend

### 1.  "Good Faith" Basis for Amendment

In their "Motion to Amend" the Complaint, the Plaintiffs request to "add one count against American Cruise Lines, Inc. ('ACL'), seeking damages for ACL's 'reckless disregard for the safety of its passengers.'" Doc. 21, at 1 (citing proposed Amended Complaint).  They also request to add "two counts derivative therefrom, for bystander emotional distress and loss of consortium."  *Id.*

As Plaintiffs explain, they "became aware of the existence of facts giving rise to [their] proposed new counts after they received an initial document production from defendant Otis Elevator Company, in compliance with [Rule] 26(a)," Fed. R. Civ. P.  *Id.*, at 2.  With the new facts, Plaintiffs "now allege that ACL had actual knowledge, long before [Merlyn] was injured, that the pump and the valve system in its elevator was worn out, defective and subject to misleveling."  *Id.* Accordingly, "Plaintiffs claim that ACL behaved recklessly by failing to repair or replace the pump and valve system and by failing to warn plaintiff [Merlyn Knapp] that the elevator misleveled."  *Id.* Plaintiffs include these new allegations in their proposed Fourth Count, at paragraphs 127 to 136 and

144.  *Id.*  They also append supporting exhibits to their proposed Amended Complaint as "Exhibit B."  *Id.*, at 24-37.

With respect to the *Foman* standard, Plaintiffs assert that their motion to amend "is made in good faith, does not result in undue delay, will not prejudice defendant's ability to defend this case, and would not be futile."  Doc. 21, at 2.  They thus assert that "[t]he court should freely give leave [to amend] when justice so requires. "  *Id.* (quoting Fed. R. Civ. P. 15(a)(2)).

In particular, Plaintiffs argue that "[t]he record demonstrates that [their] proposed amendment is made in good faith" after they received the initial disclosures from third party defendant Otis.  *Id.*, at 3.  The documents from Otis allegedly provided the factual basis for the proposed recklessness claim.  *Id.*  Plaintiffs thereafter set forth a summary of the newly disclosed facts. *Id.*, at 3-5.

Key among the new facts recounted are the following.  On June 1, 2016, Roy V. Sarrafian, P.E., the Director of Engineering for ACL, sent an email to Otis employees Ryon Keath Rosvold and Steven Haupt, stating that ACL still had "some unresolved issues with [the] elevator on the Queen of the West" and "need[ed] to get a plan together to get this wrapped up" by the end of the week. Doc. 21, at 3, 25.  On the same day, Rosvold responded, stating that Otis's technician had gone to the ship and was recommending replacement of valves and starter contacts because "the elevator is re-levelling so often that starter contacts are suffering over-use."  *Id.,* at 3,  26 (Otis document OEC-KOU0000001).

According to Plaintiffs, six days later, Otis's Rosvold  urged ACL to purchase "a whole new pump unit" to replace critical components that had become old and obsolete. *Id.*, at 3, 27.  Said new pump would make operation of the elevator "quieter," more reliable, and "better ab[le] to fine tune levelling."  *Id.*, at 3-4, 27 (OEC-KOU0000003).

Then on June 28, 2016, Otis's Rosvold emailed ACL's Sarrafian, Haupt and Fry a proposal to "replace the existing faulty Beranger valve with a new Maxton valve" at a "[p]rice [of] $14,763.09." *Id.*, at 4, 30 (OEC- KOU0000006). ACL did not, however, replace the faulty valve. *Id.*, at 4.

Ten months then passed with the QOW out of service for the winter. *Id.* On May 5, 2017, three days before Merlyn Knapp was injured, R.D. Fry of ACL emailed Otis's Rosvold, copying ACL Director of Engineering Sarrafian. In that email, Fry stated:

> [T]he elevator on the QOW seems to be having a problem leveling itself to the floor it is called to. It is either 6 inches higher or lower from the floor. Then after a period of time it levels its self. The ship will be a[t] Jantzen Beach at 11 p.m. tonight and will leave at 1:30 p.m. tomorrow. I'd like to see about getting somebody down there to look at this.

*Id.* at 4, 34 (text of email, OEC-KOU0000042).

Otis responded by sending its technician Mike Ziegler to the QOW. *Id.* Rosveld reported Ziegler's findings on May 8, 2017, at 10:54 a.m.:

> He found that the existing Beranger valve continues to be problematic and needs to be replaced. This valve is original to elevator installation. We have had no luck in finding a direct replacement for this valve. Our only suggestion is to replace with a new Maxton valve (originally proposed June, 2016). Here is that proposal again.

*Id.*, at 4.

Three hours later, at approximately 2:00 p.m., Merlyn Knapp was injured exiting the elevator on the QOW's fourth deck. QOW's Mate Matthew Gelatt made the 911 call to get help for Merlyn, which was recorded on .mp3 audio data files. *Id.*, at 4-5. In that call, Gelatt was heard stating to the operator that Merlyn "fell getting off the elevator in his scooter and the elevator wasn't level." *Id.*, at 5.

Plaintiffs present an email from ACL's Sarrafian to Otis's Rosvold on May 9, 2017, the day after Merlyn Knapp was injured. At that time, ACL decided to go forward with the valve replacement work on the elevator. *Id.* That email states:

> Consider this the confirmation. We want to get the parts ordered ASAP with expedited delivery for tomorrow. As discussed we would like the work to begin tomorrow night in Portland, OR.
>
> I will sign the proposal and get it to you within ½ [one-half] hour.

Doc. 21, at 35 (OED-KOU00000043).

Plaintiffs show that by May 10, 2017, at 3:30 p.m., the valve replacement had not been completed. At that time Sarrafian wrote an email to Rosvold, voicing his frustration about the pace of the work on the defective elevator:

> Ryon,
> When exactly will you receive the part? The way the elevator is running right now it is significantly drawing on the crew's resources to continue safe operation. We need to get the unit up and running as quickly as possible.

*Id.*, at 36-37 (OEC-KOU0000068-69).

On the basis of the documents produced by Otis, Plaintiffs "maintain . . . that they have a good faith basis to claim that ACL acted recklessly by refusing to spend the funds necessary to repair the elevator for almost one year, and until after Mr. Knapp sustained his life-changing injury." *Id.,* at 5. Plaintiffs concede that ACL "may dispute the merits of this claim, but their objection should not be sufficient to preclude [P]laintiffs from even raising it." *Id.* Plaintiffs thus seek "an opportunity to litigate the issue [of recklessness] on its merits, and develop a full evidentiary record." *Id.*

## 2. **Other *Foman* Factors**

Plaintiffs assert that as to "undue delay," they have moved to amend their complaint "early

in the case" and the "amendment will not cause delay." Doc. 21, at 6. The depositions of fact witnesses remain ongoing and the amendment should not require extension of any of the deadlines in the discovery plan.[3] As to timing, Plaintiffs also allege that "[t]o the extent that defendant ACL may claim that the Amended Complaint is subject to dismissal as a matter of law, it will have ample time to prosecute such motions as it deems necessary." *Id.*

With respect to prejudice, Plaintiffs claim that Defendants ACL and Otis will suffer none. The facts giving rise to Plaintiff's claims – Merlyn Knapp's injury on May 8, 2017, and ACL's conduct which gave rise to that injury – were already alleged in the initial complaint. *Id.*, at 6-7. Therefore, the amendment "should not unduly affect defense strategy or impact discovery efforts." *Id.*, at 7 (citing *Gross v. Donovan*, No. 3:06-CV-1703 (VLB), 2014 WL 1246498, at *1 (D. Conn. Mar. 24, 2014), for the proposition: "One of the most important considerations in determining whether amendment would be prejudicial is the degree to which it would delay the final disposition of the action."). In the case at bar, Plaintiffs emphasize that discovery has not been completed and the amendments will not, in any event, require the opposing party to expend significant additional resources to conduct discovery or prepare for trial. *Id.*, at 7.

Finally, as to futility, Plaintiffs "contend that the amendment is not futile." *Id.* It is not subject to a bar like the statute of limitations and lies "within the scope of notice of injury that has been provided to ACL." *Id.* Moreover, the amendment falls under the Court's subject matter

---

[3] Although discovery is currently set to close on October 30, 2018, the parties have jointly moved for a stay of case deadlines, which, if granted herein, will permit additional time for depositions.

jurisdiction, which is based on diversity. *Id.*[4]

From the record of the case, the Court finds that there is no indication that Plaintiffs delayed unduly in bringing these amendments, acted in bad faith, or repeatedly failed to cure deficiencies in any prior amendment. Rather, upon reviewing documents produced by Otis, Plaintiffs discovered relevant facts upon which to base their newly proposed claims. They then promptly moved to amend their Complaint for the first and only time.

Furthermore, the Court concurs with Plaintiffs that, given the present status of the case, allowing the proposed amendments would not prejudice ACL or Otis. Discovery has not closed; and there is no indication that it will be unduly expanded due to the proposed amendments. As the Second Circuit noted in *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993), undue prejudice arises when the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction. None of those problems will result from Plaintiffs' proposed amendments.

Having found no other basis for denying amendment, the Court will turn to the actual text of the Amended Complaint to determine whether including the proposed claims would be futile – *i.e.*, whether they fail to state claims upon which relief can be granted.

---

[4] As discussed in this Court's "Memorandum and Order" filed on June 25, 2018 [Doc. 23], Plaintiffs assert that the Court's subject matter jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332(a), as well as maritime jurisdiction, 28 U.S.C. § 1333(1), and supplemental jurisdiction under 28 U.S.C. § 1367. Doc. 23, at 2-4; *see also* Doc. 21, ¶¶ 5-9.

### 3. **Futility - Substance of Proposed Amendments**

Upon initial examination of the counts and language of the proposed amendments, the Court notes that Plaintiffs have added Counts Four to Six in their Amended Complaint. In the Fourth Count, they begin pleading their claim for "recklessness" by alleging that ACL was knowingly reckless in: primarily targeting wealthy elderly passengers for their cruises, knowing that many of these passengers "suffered from health conditions and handicaps that limited their mobility;" and inducing such passengers to book passage on the QOW by representing that the QOW "was equipped with handicap-accessible rooms and an elevator for ease of movement between decks." Doc. 21, at 17 (¶¶ 119-20). Plaintiffs further allege that the Knapps relied on such representations and promises to book their cruise on the QOW for May 6-13, 2017. *Id.*, at 18 (¶ 121). Given the Knapps' stateroom assignment on the second deck and the QOW's main dining room's location on the first deck, ACL knew that the Knapps would have to "utilize the elevator to transport [Merlyn] and his scooter from his stateroom to the dining hall." *Id.*, at 18 (¶ 126). Furthermore, "[f]or years prior to May 6, 2017, ACL knew that the elevator in its vessel was old, outmoded, and in need of repair or replacement." *Id.*, at 18 (¶ 127).

Plaintiffs then incorporate the information they obtained from the Otis document production, including, for example, that "[a]s of June 1, 2016, . . . an Otis representative notified ACL senior engineering staff in writing that the elevator was malfunctioning in that it did not accurately stop level with the landing." *Id.*, at 18-19 (¶ 129). Given this problem with the elevator, on June 28, 2016, Otis proposed to replace the "existing faulty Beranger valve" with a "new Maxton valve" at a cost of $14,763.09. *Id.*, at 19 (¶ 131). Although ACL evaluated the proposal, knowing that "the elevator did not accurately stop level with the landing, "which constituted a tripping hazard" to its

passengers," ACL chose "not to purchase the Maxton valve repair from Oits" and not to inform its passengers of this decision. *Id.*, at 19 (¶¶ 133-34).

Furthermore, in this "recklessness" count, Plaintiffs allege that on the day before the Knapps' scheduled departure on the QOW, May 5, 2017, ACL's shipboard engineer wrote to Otis that the elevator was "having a problem leveling itself to the floor it is called to," such that it was "either 6 inches higher or lower from the floor." *Id.*, at 19 (¶ 135). Yet, ACL "chose not to warn its cruise ship passengers (including plaintiffs) of the hazard posed by the misleveling elevator." *Id.*, at 19 (¶ 136).

Plaintiffs recount the sequence of events on May 8, 2017, culminating in Merlyn's injury to his neck upon backing his scooter off the misleveled elevator on the fourth deck. *Id.*, at 19-20 (¶¶ 137-43). Plaintiffs then sum up their recklessness charge, basing it on the following factual allegations: (1) ACL "knew that it marketed to an older demographic," which "includ[ed] passengers with mobility problems who would need to use the elevator;" ACL "deliberately chose not to implement the recommended repair to correct the known misleveling problem with its elevator;" ACL knew that QOW would "be out of service during the winter of 2016 and the spring of 2017 and that ACL and Otis would have ample time to make the necessary repairs;" ACL knew that the price of the repair was "about $16,000, or about the price of four cruise tickets;" ACL knew that, due to their "physical limitations," the Plaintiffs would need to use the elevator to move between decks on the QOW; and ACL was aware that the elevator had "worn out valves that caused it to mislevel," but failed to follow the requirement to report this "hazardous condition" to the United States Coast

Guard Captain of the Port under 46 C.F.R. § 122.203;[5] and ACL "chose to perform temporary or stopgap repairs in the elevator without gaining permission from the Officer in Charge of Marine Inspection," thereby violating provisions of 46 C.F.R., "including 46 C.F.R. § 176.700."[6]  Doc. 21, at 20-21 (¶¶ 144 (a)-(g)).

Finally, Plaintiffs allege that ACL was reckless in choosing to operate the vessel during Plaintiffs' cruise, knowing that the QOW had a defective elevator immediately prior to the vessel's departure and failing to notify or warn the Plaintiffs or other passengers about the elevator misleveling.  *Id.,* at 21 (¶¶ 144 (h)-(j)).  According to Plaintiffs, in choosing not to spend the money to make the necessary repairs, ACL exposed its passengers, including the Plaintiffs, to a "known and entirely unnecessary risk," in an effort to improve the bottom-line profitability of its cruise ship operations."  *Id.*, at 21-22 (¶ 144(k)).

The Court finds that the allegations set forth in this recklessness count are sufficient to state a claim under Connecticut law.  As the Connecticut Appellate Court held in *Sheiman v. Lafayette Bank & Trust Co.,* 4 Conn. App. 39, 45-46 (1985):

> Recklessness is a state of consciousness with reference to the consequences of one's acts.  It requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent. It is more than negligence, more than gross negligence.

---

[5]  46 C.F.R. § 122.203 provides that "[w]henever there is a hazardous condition . . . on board the vessel, the owner, master, agent, or person in charge shall immediately notify the Captain of the Port of the port or place of destination and the Captain of the Port of the port or place in which the vessel is located of the hazardous condition."

[6]  Pursuant to 46 C.F.R. § 176.700(a), "[r]epairs or alterations to the hull, machinery, or equipment that affect the safety of the vessel must not be made without the approval of the cognizant OCMI [Officer in Charge, Marine Inspection], except during an emergency."

4 Conn. App. at 45-46 (citations and internal quotation marks omitted). Consistently and more recently, the Connecticut Appellate Court summarized:

> One is guilty of reckless misconduct when knowing or having reason to know of facts which would lead a reasonable [person] to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him.

*Craig v. Driscoll*, 64 Conn. App. 699, 721 (2001) (citing Restatement, 2 Torts, § 500) (internal quotation marks omitted), *aff'd,* 262 Conn. 312 (2003).

In the case at bar, Plaintiffs have alleged that ACL knew that the defective valve on the elevator, which caused the elevator to mislevel, created an unreasonable risk of bodily harm to the passengers of the QOW. According to Plaintiffs' allegations, ACL was explicitly informed of this "misleveling" problem by Otis. *See* Doc. 21, at 18 (¶¶ 127, 129-32). ACL allegedly "knew that the elevator did not accurately stop level with the landing, resulting in [the] QOW's passengers experiencing an unexpected discrepancy between the level of the elevator car and the level of the landing, which constituted a tripping hazard." *Id.*, at 19 (¶ 132). Nonetheless, ACL consciously chose not to repair the hazardous condition. Specifically, ACL "chose not to purchase the Maxton valve repair from Otis or anyone else" and "chose not to disclose to its passengers that it had declined to repair the elevator." *Id.,* at 19 (¶¶ 133-34). In other words, ACL is alleged to have consciously chosen not to repair a problem which a reasonable man would have known created an unreasonable risk of bodily harm to others. ACL also chose not to warn its passengers about the risk.

When analyzing futility of a proposed amendment under Rule 15(a)(2), the district court determines whether the amended claim could withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Dougherty v. Town of North Hempstead Bd. Of Zoning Appeals*, 282 F.3d 83, 88

(2d Cir.2002) ("An amendment to a pleading will be futile if a proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6)."). Accordingly, the court employs the "plausibility" standard set forth in the United States Supreme Court's seminal holding of *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[7] Under *Iqbal*, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S 544, 555 (2009)).

In the case at bar, at the pleading stage, Plaintiffs' factual allegations in the Fourth Count are sufficient to permit the requested amendment. This recklessness claim is plausible under *Iqbal*, as drafted. In particular, Plaintiffs' recklessness claim "has facial plausibility" because the Plaintiffs have pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

To recapitulate, as alleged in the proposed Amended Complaint, including the appended Exhibits [Doc. 21]: Merlyn Knapp suffered his injury on board the QOW on *May 8, 2017*, as the result of the vessel's elevator misleveling. The documents appended in Exhibit B appear to establish that on *June 1, 2016*, almost a year previously, employees of ACL and Otis had an exchange of e-mailed communications, in which the ACL employee told Otis that ACL continued to have "some

---

[7] The Second Circuit has consistently adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*. *See, e.g., Shin v. Am. Airline, Inc.*, 726 F. App'x 89, 90 (2d Cir. 2018); *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017); *Christine Asia Co. v. Ma*, No. 16-2519-CV, 2017 WL 6003340, at *1 (2d Cir. Dec. 5, 2017).

unresolved issues" with the QOW's elevator, and Otis's employee responded by advising ACL that an Otis technician (who had boarded the vessel that day) was recommending replacement of elevator valves and starter contacts because "the elevator is re-leveling so often that starter contacts are suffering over-use." This exchange supports Plaintiffs' allegation that ACL was made aware by Otis of the nature and cause of *precisely the same elevator malfunction* that caused Merlyn Knapp's grievous injuries eleven months later. Otis followed up. On or about June 7, 2016, Otis's employee urged his opposite number at ACL to purchase "a whole new pump unit" for the QOW elevator, to replace old and obsolete components; the new pump, Otis advised ACL at that time, would make the elevator's operation quieter, more reliable, and (significantly) better able to "fine tune leveling." The exchanges *in 2016* between ACL and Otis came to an end when on June 28, 2016, Otis's employee e-mailed to the ACL personnel a proposal to "replace the existing faulty Beranger valve with a new Maxton valve" at a price of $14,763.09.

As set forth in Plaintiffs' recklessness claim, there is no indication that ACL made any response to Otis's proposal of June 28, 2016. On May 5, *2017* (the day before the Knapps boarded the QOW at Portland for the one-week river cruise), ACL's employee e-mailed his opposite number at Otis and stated: "The elevator on the QOW seems to be having a problem leveling itself to the floor it is called to. . . . I'd like to see about getting somebody down here to look at this."[8] Otis promptly dispatched another technician to the vessel, whose findings Otis communicated to ACL in an e-mail sent at 10:54 a.m. on May 8, 2017: "He found that the existing Beranger valve *continues to be problematic* and needs to be replaced." (emphasis added). The plausible reading of this advice

---

[8] For Otis, ACL's May 2017 communication may have invoked the shade of Yogi Berra: "Déjà vu all over again."

17

is that the elevator's misleveling in June of 2016 was still causing problems in May of 2017. Otis's recommendation to ACL was blunt, to the point, and (significantly) repetitive. Otis's May 8, 2017, e-mail to ACL concludes: "This valve is original to the elevator installation. We have had no luck in finding a direct replacement for this valve. Our only suggestion is to replace with a new Maxton valve (*originally proposed June, 2016). Here is that proposal again.*" (emphasis added). Otis sent this e-mail to ACL three hours before the QOW's elevator, whose misleveling appears to have been chronic, misleveled again and precipitated Merlyn Knapp's injuries. Accepting the veracity of the well-pled allegations in the Fourth Count, construing all reasonable inferences in Plaintiffs' favor, it is plausible to infer that if ACL had accepted Otis's June 2016 proposal and replaced the old elevator valve with a new one, the Knapps' river cruise would have been that carefree, restorative voyage of which they dreamt and for which they paid.

The briefs of counsel for ACL on these motions labor to suggest that this unfortunate sequence of events may fairly be ascribed to Otis. The question on Plaintiffs' Rule 15 motion to amend their complaint to assert recklessness claims against ACL is whether ACL (whose burden it is) has made a showing that the proposed amendment would be futile: that is to say, the actionable misconduct can be ascribed only to Otis as a matter of law, and Plaintiffs do not allege against ACL plausible claims of recklessness that would survive a motion to dismiss. ACL does not and cannot make that showing.

As alleged, Otis's proposal to ACL in June of 2016 – replace the vessel elevator's original, failing parts with new ones – would be described to first-year law students in Contracts I as an *offer* by Otis which ACL could *accept* (thereby creating a *contract* between the parties) or *reject* (explicitly by negative response) or implicitly (by disregarding the offer for a year). Otis, with its

alleged contracted-for expertise in the manufacture, installation and maintenance of elevators on impressive vessels like the QOW, identified for ACL the cause of QOW's elevator misfunction, recommended the solution and specified its cost. But Otis could not compel ACL to contract with it and correct the vessel elevator's misleveling in June of 2016. ACL chose not to do so at that time, for reasons the present record does not reveal. It appears that because the elevator's shortcomings were not corrected, Merlyn Knapp was injured in May 2017. The duties of the owner of a vessel on navigable waters to passengers for hire under common law and maritime law were owed to the Knapps by ACL, not Otis.

While this Ruling says nothing about the viability of any claim the Knapps may assert against Otis, the fact-intensive pleadings demonstrate the Plaintiffs' entitlement under Rule 15(a), in the interest of justice, to amend their complaint so as to assert claims for reckless misconduct against ACL. Their motion for leave to do so will accordingly be granted. ACL counsel's brief in opposition cites cases more in an exercise of misplaced advocacy than as a source of apposite authority. Whether on a full plenary record Plaintiffs can prove these claims is a question for another day.

## C. ACL's Opposition to Proposed Amendment

### 1. Standard for Recklessness

In making its finding of plausibility regarding Plaintiffs' recklessness claim, the Court has considered the following opposition from ACL. In its response to Plaintiffs' motion to amend, ACL opposes Plaintiffs' proposed amendment, arguing first that Plaintiffs cannot plead sufficient facts to bring a recklessness claim in the Fourth Count. ACL recites facts to show that Otis was engaged as the exclusive agent and expert by ACL "to recertify, inspect, repair, troubleshoot, test, and survey

the QOW's elevator." Doc. 25, at 6. Moreover in the months and days leading up to the misleveling incident which injured Merlyn Knapp, Otis "had worked on the QOW's elevator numerous times," had tested and inspected the QOW's elevator to provide ACL with "a clean 'Certificate of Inspection'" in 2017, and had "reported no problems with the elevator to ACL." *Id.*, at 6-7. Specifically, "Otis did not mention or reference the Beranger valve or discuss the Maxton valve" – the valves related to leveling – "in connection with its March 9, 2017 inspection," just "weeks before the alleged incident." *Id.*, at 7.

According to ACL, on May 5, 2017, ACL's Mr. Fry emailed Otis's Mr. Rosvold to inform him that "the QOW's elevator 'seems to be having a problem leveling itself to the floor it is called to.'" *Id.*, at 8. Fry further told Rosvold that "ACL wanted an Otis technician to work on the issue immediately, as the QOW was set to sail the following day at 1:30 pm." *Id.* The following day, a Mr. Ziegler allegedly repaired the elevator and "did not report any continued problems with the elevator." *Id.* ACL thus concludes that "if Plaintiffs' injuries were caused by anyone other than Plaintiffs," they were "caused solely by the primary, active, and sole negligence, culpable conduct, wrongful acts and/or omissions of Otis Elevator, and any fault of ACL was secondary and passive." *Id.*

ACL surmises that under these facts, recited by its counsel, Plaintiffs cannot meet the standard to allege that ACL was reckless because "[t]here is a wide difference between negligence and a reckless disregard of the right or safety of others." *Id.*, at 9 (citing *Tiffany v. Spring Lake Vill. Condo. 1, Inc.,* No. CV146024824S, 2014 Conn. Super. LEXIS 3114, at *3 (Conn. Super. Ct. Dec. 18, 2014)).

ACL also points to Connecticut court cases in which allegations that a party knew of, but

failed to warn others, or monitor or repair known defects were insufficient to state claims for recklessness. *Id*. ACL relies on the case of *Deptulski v. Ansonia Acquisitions*, *LLC,* No. KNLCV156025135S, 2016 Conn. Super. LEXIS 175, *6 (Conn. Super Ct. Jan. 25, 2016), an unpublished opinion by the Connecticut Superior Court. In that case, a defective staircase collapsed in a rented apartment, causing the decedent to fall to his death. The plaintiff, administrator of the decedent's estate, alleged that the defendants, two limited liability companies who owned and/or operated the apartments, had notice that the stairs were defective and hazardous to users but failed to inspect, make repairs, make the area safe, or warn users.

ACL states that "[i]n granting the defendants' motion to strike, the court concluded that the 'plaintiff has alleged facts amounting to nothing more than negligence.'" Doc. 25, at 10-11 (quoting *Deptulski*, 2014 Conn. Super. LEXIS 3114, at *3). In ACL's opinion, "[t]he inadequate allegations in Plaintiffs' proposed amended complaint fare no better" than those in *Deptulski*. *Id.*, at 11.

I find, however, that the *Deptulski* complaint is clearly distinguishable from the presently proposed amended complaint. In *Deptulski*, the "plaintiff's factual allegations in the negligence count and recklessness count [were] identical." 2016 Conn. Super. LEXIS 175, at *3. The only difference was that in the negligence count, the plaintiff alleged that the defendants' actions amounted to "negligent acts or omissions," and in the recklessness count, the actions amounted to "reckless, willful and/or wanton acts or omissions." *Id.*, at *3-4. The *Deptulski* court thus stated:

> To state a claim for common-law reckless misconduct, the pleader must set forth specific, subordinate, supporting facts. *See Dumond v. Denehy*, 145 Conn. 88, 90, 139 A.2d 58 (1958); D. Wright, J. FitzGerald, W. Ankerman, *Connecticut Law of Torts (Third Ed., 1991)*, §61. "Simply using the word, 'reckless' or 'recklessness' is not enough. A specific allegation setting out the conduct that is claimed to be reckless or wanton must be made." *Dumond v. Denehy*, . . . 145 Conn. [88], 91 [1958]).

21

*Id.*, at  *5.[9]

In the case at bar, however, the Plaintiffs have alleged a particular set of facts to show recklessness, which as the court in *Deptulski* describes, is "more than negligence," "more than a failure to exercise a reasonable degree of watchfulness to avoid danger," and "more than "mere mistake resulting from inexperience, excitement, or confusion, and more than . . . simple inattention."  *Id.,* at *6 (citations omitted).

Moreover, the *Deptulski* court rejected the defendants' assertion that "passive conduct or omissions, such as a failure to inspect or repair, can never, as a matter of law, rise to the level of conduct that would constitute recklessness." *Id.*.  The *Deptulski* court thus clarified that it was "not persuaded that there is any such per se rule in the law;" and "[no] such rule has been articulated by any appellate court, and the trial courts that have addressed the issue are in disagreement." *Id.*  The *Deptulski* court declared that "the better approach is to evaluate the particular allegations of the complaint, regardless of whether the conduct is an act of commission or omission, and to determine whether they show facts that 'take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.'"  *Id.*, at  *7  (citing *DiTeresi v. Stamford Health System, Inc.*, 142 Conn. App. 72, 90 (2013)).

Utilizing such a fact-specific test, this Court finds that Plaintiff's allegations rise to the level of describing "highly unreasonable conduct" in a situation where there was indeed "a high degree of danger" that was apparent.  Plaintiffs allege that ACL knew of the serious misleveling problem and yet allowed the QOW guests to use the elevator, to their peril, without warning of a defect that

---

[9] Summarizing its holding, the *Deptulski* court stated: "The plaintiff has alleged facts amounting to nothing more than negligence in Count Two, not recklessness, and *simply using the work reckless does not suffice*." 2016 Conn. Super. LEXIS 175, at *6 (emphasis added).

would foreseeably result in injury and without making the necessary repair. Guests on an elevator in a cruise ship are often excited to be aboard and could easily fail to note the misleveling of the elevator and fall to their injury. A cruise ship that purposely fails to take the necessary steps in ensure its passengers' safety may be deemed "reckless" in "a situation where a high degree of danger is apparent." As in *Deptulski*, this Court rejects defendant ACL's argument that any failure to inspect or repair fails to rise to the level of recklessness.

In addition, the Court notes that ACL seeks to refute the allegations in Plaintiff's proposed amended complaint by presenting, interpreting, and/or arguing "facts" its counsel has set forth in its opposition brief, including, for example, ACL's version of its interactions with Otis in servicing the elevator. First of all, statements by counsel are not evidence. Second, "the court should not consider the merits of a claim or defense on a motion to amend unless the amendment is clearly frivolous or legally insufficient on its face." *Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 396-97 (E.D.N.Y.1998) (citation and internal quotation marks omitted). *See also Schaghticoke Tribal Nation v. Norton*, No. 3:06CV81 PCD, 2007 WL 867987, at *11 (D. Conn. Mar. 19, 2007). The party opposing a motion for leave to amend has the burden of proving that amendment is futile based on the allegations in the claim itself, and not by disputing issues of fact.

The Court recognizes that the parties may have disputed issues of material fact to be examined at summary judgment or resolved in trial. However, on a motion to amend the complaint, the court's duty is not to resolve disputed factual issues, but rather to determine whether the allegations set forth in the complaint state a claim upon which relief may be granted. If there is no

plausible claim, the amendment is futile.[10]

As described above, following *Iqbal*, the Second Circuit has embraced the concept of a complaint being legally sufficient if it is plausible. *See, e.g., Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) ("To survive a motion to dismiss [pursuant to Rule 12(b)(6) ], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (citing and quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny. In deciding whether to dismiss a complaint under Rule 12(b)(6), or to grant leave to file an amended complaint under Rule 15(a)(2), the Court accepts the truth of well-pleaded factual allegations, and considers whether they state a claim that is plausible on its face. The facts alleged in Knapp's proposed amended complaint state plausible claims.

2. **Choice Not to Make Repairs**

ACL also argues that choosing not to make repairs does not *per se* equate with recklessness. In support, ACL cites *Jiminez v. American Steak House, LLC*, Case No. CV106001715S, 2010 Conn. Super. LEXIS 2965 (Conn. Super. Ct. Nov. 15, 2010). ACL states that in *Jiminez*, "the plaintiff alleged that the defendant [restaurant owner]: (1) consciously chose not to inspect the premises [of its restaurant]; (2) made a willful and conscious decision not to warn customers of the dangerous condition created by a damaged restaurant booth due to the burden and/or costs associated

---

[10] Even were this a pending motion for summary judgment instead of a motion to amend, counsel's statements in a brief are not evidence in these proceedings. "Only sworn testimony of witnesses may comprise evidence, if relevant and admissible." *Travelers Indem. Co. v. Excalibur Reinsurance Corp.*, No. 3:11-CV-1209 CSH, 2013 WL 4012795, at *1 (D. Conn. Aug. 5, 2013). *See also, e.g.*, *United States v. Milikowsky*, 896 F. Supp. 1285, 1311 (D. Conn. 1994), *aff'd*, 65 F.3d 4 (2d Cir. 1995) (describing as a curative jury instruction: "statements, questions, and arguments of counsel are not evidence").

with presenting such a warning; and (3) made a willful and conscious decision not to repair the restaurant booth due to the burden and/or costs associated with that repair." Doc. 25, at 12 (citing *Jiminez*, 2010 Conn. Super. LEXIS 2965, at *2 n.2). ACL states that nonetheless the defendant's motion to strike the recklessness count was granted because such allegations that the defendant sought to avoid costs by tolerating the status quo were insufficient. *Id.* (citing *Jiminez*, 2010 Conn. Super. LEXIS 2965, at *3). ACL thus argues that Plaintiffs' proposed amendment with its "Defendant-sought-to-avoid-costs" refrain should be stricken as well.

Furthermore, ACL asserts that it did not decide not to repair to avoid costs; rather, "substantial information provided by Otis . . . amply demonstrates that the Beranger valve presented no danger to ACL's crew and passengers." Doc. 25, at 12. "If the replacement of this valve was critical to the safe operation of the elevator, surely Otis would have mentioned it when its 'crew was on-site th[e] week [of March 2017],' and when it proposed other preventative maintenance or certification work in January and March 2017." *Id.*, at 13.

The Court finds that as in *Deptulski*, the plaintiff in *Jimenez* inserted the exact same allegations in both her negligence and recklessness claims. The *Jimenez* court thus agreed with the defendant that the "plaintiff cannot transform a negligence count into a count for wilful and wanton misconduct merely by appending a string of adjectives to allegations that clearly sound in negligence." 2010 Conn. Super. LEXIS 2965, *2.

In addition, with respect to expenditure of costs on repairs, the *Jimenez* court held that it did not accept that "a decision to avoid costs by tolerating the status quo is *ipso facto* a reckless decision, such that an injury resulting from it must be practically considered intentional." *Id.* In other words, not all decisions to maintain the status quo regarding repairs are reckless. "Recklessness requires

a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent."[11]  *Id.*

Here, Plaintiffs have alleged facts to support recklessness which go beyond those stated in their negligence account.  *See* Part II.B.3., *supra.* Moreover, ACL once again attempts to refute the allegations of Plaintiffs' proposed claim of recklessness with conflicting factual assertions by its counsel in its opposition brief.  Such statements do not comprise evidence.  If there is admissible evidence to back them, that evidence must be presented at the proper time and in the proper context – either upon summary judgment, following full discovery, or at trial.

---

[11]  The alleged danger in the *Jimenez* case, the restaurant booth, had a detached piece at the bottom.  When the plaintiff, who had been sitting in the booth, got up to leave, she caught the bottom of her foot on the detached piece and fell, causing her serious and painful injuries.  Plaintiff premised her recklessness claim against the defendant restaurant owner on an alleged decision to avoid costs by leaving the restaurant booth in its *status quo*, instead of repairing or replacing it.  *See Jimenez*, 2010 Conn. Super. LEXIS 2965, *2 .  She thus stated that her fall was due to the "willful, wanton, and reckless conduct of the defendant" in failing to inspect the premises and in making the conscious decision not to warn customers of the damaged booth and/or not to repair the booth due to costs associated with warning and/or repair. *Id.*, at *2 n.2. Plaintiff Jimenez did not, however, allege facts to demonstrate that defendant actually knew of the existing hazard with respect to this booth and failed to make it safe.  Rather, she incorporated her negligence allegations – that defendant "knew or should have known" of the defect – but failed to plead "knowledge of a serious danger to others." *Id.,* at *2 (citation omitted) & n.1. As the *Jimenez* court stated, to be reckless, a defendant must actually know of the dangerous condition and make "a conscious choice of a course of action" as to a "serious danger to others." *Id.*, at *2.  Under the facts alleged in *Jimenez*, failure to repair was thus insufficient to plead "highly unreasonable conduct involving an extreme departure from ordinary care." *Id.*  The allegations regarding cost of repair and tolerance of the "status quo" failed to show that an injury resulting from the failure to repair "must be practically considered intentional." *Id.*, at *3 (citation omitted).  The court thus struck the restlessness claim, which left the negligence claim to proceed. *Id.*

### 3. **Waiver of Punitive or Consequential Damages**

In addition, in opposing Plaintiffs' proposed "recklessness" amendments, ACL claims that Plaintiffs have contracted away their right to sue for consequential or punitive damages.[12]  In its opposition, ACL thus states that "[a]ny potential amendment of the complaint would be futile because Plaintiffs waived any claim they have for consequential or punitive damages."  Doc. 25, at 13.  ACL asserts that when the Plaintiffs purchased their tickets for their trip aboard the QOW, they entered into a contract with ACL regarding "Terms & Conditions of Passage." *Id.*  Included in that contract's terms and conditions was a "LIMITATION OF LIABILITY" provision, stating: "Passenger WAIVES all claims for consequential or punitive damages." *Id.*  According to ACL, the Knapps were "expressly notified of this provision before they purchased their tickets and received a printed copy of ACL's terms and conditions months before [their] cruise on the QOW." *Id.*  ACL asks the Court to interpret this "clear and unambiguous" contract to "give effect according to its terms." *Id.* (citation omitted).

The fact that ACL alleges contractual waiver does not negate Plaintiffs' right to amend their complaint.  Plaintiffs may state any plausible claims; and then ACL may answer or respond, presenting whatever defenses it may have to such claims.  Under Connecticut law, the affirmative defense of "[w]aiver is defined generally as 'the voluntary relinquishment of a known right.'" *RBC Nice Bearings, Inc. v. SKF USA, Inc.*, 318 Conn. 737, 748 (2015) (quoting *MacKay v. Aetna Life Ins. Co.*, 118 Conn. 538, 547 (1934)).  Therefore, whether the Knapps contractually waived their rights to recover certain damages may involve issues of fact, such as whether they intended to

---

[12]  ACL does not specify whether this argument is directed solely to the Fourth Count or also encompasses the derivative Fifth and Sixth Counts.  Regardless of that designation, the Court's analysis of the argument is unaltered.

voluntarily relinquish these rights. It is not the Court's function to resolve such factual disputes with respect to the plausibility of a claim on a motion to amend. Unlike cases of res judicata, statute of limitations, collateral estoppel, or statutory waiver, where the defense appears on the face of the complaint, the district court cannot dismiss a proposed amendment on facts outside the complaint. As in a motion to dismiss, the court may only consider allegations in the complaint, documents attached or incorporated into the complaint, and matters of public record. *See generally* 5A C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 1364, 475-80 (1990). *See also, e.g.*, *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, No. 17-2654-CV, 2018 WL 4622696, at *3 (2d Cir. Sept. 27, 2018) ("For Rule 12(b)(6) purposes, the complaint include[s] any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (citation and internal quotation marks omitted).

Following *Iqbal*, the Second Circuit has embraced the concept of a complaint being legally sufficient if it is plausible. *See, e.g., Absolute Activist Value Master Fund, Ltd.*, 677 F.3d at 65. The court decides whether the plaintiff has stated a valid claim under any possible theory, accepting the allegations as true and construing all reasonable inferences in the plaintiff's favor. A factual dispute regarding the existence of a potential defense does not factor into this plausibility analysis.

Here, the facts alleged in the Knapp's proposed amended complaint state plausible claims. ACL may later plead and present evidence of its affirmative defense regarding contractual waiver.[13]

---

[13] With respect to ACL's proposed waiver defense, however, the Court notes that once ACL presents the contract at issue as evidence of its defense, there will be legal issues to be resolved. For example, in addition to contract interpretation, there is the potential applicability of a federal statute, 46 U.S.C. § 30509(a). With respect to vessels, Section 30509(a) generally prohibits "[t]he owner, master, manager, or agent of a vessel transporting passengers between ports in the United States, or between a port in the United States and a port in a foreign country," from including in a "contract a provision limiting the liability of the owner, master, or agent for personal injury or death caused

## 4. **Plaintiffs' Proposed Derivative Claims**

As set forth *supra*, Plaintiffs have proposed two new claims in the Fifth and Sixth Counts that derive from their recklessness claim: bystander emotional distress and loss of consortium. ACL opposes the addition of those claims, asserting in a footnote that Plaintiffs' proposed "'derivative' counts (Counts 5 and 6 of the proposed Amended Complaint) merely repeat, word for word, Counts 2 (Bystander Emotional Distress) and 3 (Loss of Consortium)." Doc. 25, at 5 n.1. ACL concludes that, "[a]s simply duplicative counts, with no additionally pled facts, the Court should deny Plaintiffs' motion to add such claims." *Id.* In other words, ACL alleges that these claims are futile, failing to state claims upon which relief may be granted.

### a. **Bystander Emotional Distress**

Comparing Plaintiffs' Second and Fifth Counts for "bystander emotional distress," the Court finds that they are not actually identical. The claim in the Second Count is based upon, and incorporates by reference, the factual allegations which give rise to Plaintiffs' negligence claim. *See* Doc. 21, at 16 (¶¶ 35-68) ("Second Count," incorporating by reference "Paragraphs 1 through 34 of the First Count"). In contrast, the Fifth Count, also based on "Bystander Emotional Distress,"

---

by the negligence or fault of the owner or the owner's employees or agents." *See*, *e.g.*, *Johnson v. Royal Caribbean Cruises, Ltd.*, 449 F. App'x 846, 847 (11th Cir. 2011) (holding that pursuant to § 30509, passenger's "waiver of liability" was void with respect to her claim that cruise ship's negligence resulted in her personal injury).

Furthermore, even outside the maritime context, a contract between a carrier and passengers may be deemed an invalid "adhesion contract" where the contract is "formed as a 'product of a gross inequality of bargaining power' between parties." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (quoting *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 831 (S.D.N.Y. 1996)). Such contracts are generally unenforceable as "offend[ing] basic notions of civility and fair play," a concept that "evolved from public policy." *Id.* at 168.

incorporates by reference the factual allegations giving rise to the "recklessness" claim in the Fourth Count. *Id.*, at 22 (¶¶ 152-95) ("Fifth Count," incorporating by reference "Paragraphs 108 through 151 of the Fourth Count"). Therefore, the Fifth Count alleges that ACL's recklessness, as opposed to its negligence, led to Beverly's losses due to bystander emotional distress.

The Connecticut state law claim for "bystander emotional distress" has been defined as "a derivative claim, pursuant to which a bystander who witnesses another person (the primary victim) suffer injury or death as a result of the negligence of a third party seeks to recover from that third party for the emotional distress that the bystander suffers as a result."[14] *Squeo v. Norwalk Hospital Assn.*, 316 Conn. at 564, 113 A.3d 932 (emphasis added). Alternatively, such a claim may be based on the reckless, as opposed to negligent, injury of the primary victim, which causes the bystander witness to suffer emotional distress. *See, e.g., Craig*, 64 Conn. App. at 721-22 (holding that mother and brother stated causes of action for *negligent and reckless* infliction of bystander emotional distress, finding that plaintiffs "may claim alternative relief") (emphasis added).

Consequently, depending on the particular allegations of the complaint, a plaintiff may bring a claim in one count for "negligent infliction of bystander emotional distress" and a second count for

---

[14]   In *Clohessy v. Bachelor*, 237 Conn. 31, 56 (1996), the Connecticut Supreme Court delineated the required elements of "bystander emotional distress" as follows:

> To summarize, we conclude that a bystander may recover damages for emotional distress under the rule of reasonable foreseeability if the bystander satisfies the following conditions: (1) he or she is closely related to the injury victim, such as the parent or the sibling of the victim; (2) the emotional injury of the bystander is caused by the contemporaneous sensory perception of the event or conduct that causes the injury, or by arriving on the scene soon thereafter and before substantial change has occurred in the victim's condition or location; (3) the injury of the victim must be substantial, resulting in his or her death or serious physical injury; and (4) the bystander's emotional injury must be serious, beyond that which would be anticipated in a disinterested witness and which is not the result of an abnormal response.

"reckless infliction of bystander emotional distress." Such claims are based on different, alternative theories so are not duplicative. In discussing two such bystander emotional distress claims, the Appellate Court of Connecticut explained in *Craig v. Driscoll*, 64 Conn. App. 699 (2001), *aff'd,* 262 Conn. 312 (2003):

> We conclude that the allegations of [recklessness in] counts four and six go beyond the allegations of carelessness and negligence alleged in counts three and five. Counts four and six, therefore, allege a separate cause of action. Whether the evidence will support a reckless cause of action is not to be decided here. *See DeVita v. Esposito*, 13 Conn.App. 101, 105, 535 A.2d 364 (1987) (alternative pleading justified when pleader does not know all facts necessary to make election), *cert. denied*, 207 Conn. 807, 540 A.2d 375 (1988). The question is whether the complaint states a cause of action. We conclude that counts four and six state a cause of action, that a jury should determine whether the defendants proximately caused the plaintiffs' injuries and, if so, whether their acts were reckless or merely negligent.

44 Conn. App. at 722.

In the present case, as in *Craig*, the claim in the proposed Fifth Count includes facts that "go beyond the allegations of carelessness and negligence" alleged in the Second Count for negligent "bystander emotional distress claim." 64 Conn. App. at 722. The Fifth Count is thus not duplicative. Should ACL wish to challenge the merits of either of the Second or Fifth Counts, it may do so at summary judgment or in trial.

### b. Loss of Consortium

As to the Third and Sixth Counts, these two claims seek recovery for "loss of consortium," based on ACL's negligence and recklessness, respectively. Again, the earlier claim, the Third Count. incorporates the negligence allegations in Paragraphs 1 through 34 of the First Count; and the proposed Sixth Count incorporates the allegations of recklessness in Paragraphs 108 to 151 of the Fourth Count. *See* Doc. 21, at 17 (¶¶ 73-106); *id.*, at 23 (¶¶ 200-43). These claims are thus not

identical, but rather alternative theories of recovery.

Loss of consortium was first recognized as a cause of action in Connecticut for both spouses in *Hopson v. St. Mary's Hospital,* 176 Conn. 485, 494-96 (1979); and the term "consortium" generally encompasses "the services and the financial support of a spouse" and a "variety of intangible relations which exist between spouses living together in marriage," 176 Conn. 487. The intangible elements include, for example, "affection, society, companionship and sexual relations." *Id.* Like a "bystander emotional distress" claim, loss of consortium is a derivative cause of action "dependent on the legal existence of the predicate action." *Cavallaro v. Hospital of St. Raphael*, 92 Conn. App. 59, 62, n. 5 (2005) (internal quotation marks omitted), *cert. denied*, 276 Conn. 926 (2005).

In the Third Count, the action is predicated on ACL's negligence in causing harm to Plaintiff Beverly Knapp's husband; and in the Sixth count, the action is predicated on ACL's recklessness in causing those injuries. The Third and Sixth Counts thus comprise alternative theories of liability so are not duplicative in their allegations. For this reason, the Court will allow them to proceed. They are not futile.

Furthermore, the Court notes that as to the proposed derivative claims in the Fifth and Sixth Counts, ACL has presented no legal support for its argument to dismiss them. ACL merely declares them "duplicative." If a party's position is "not sufficiently supported legally or factually to enable the Court to assess its merits," the Court may not base a ruling on that asserted position. *See, e.g.*, *Country Club of Fairfield, Inc. v. New Hampshire Ins. Co.*, No. 3:13-CV-00509 (VLB), 2014 WL 3895923, at *8 (D. Conn. Aug. 8, 2014); *see also* D. Conn. L. R. 7(a) ("Any motion involving disputed issues of law shall be accompanied by a memorandum of law" and "[f]ailure to submit a

required memorandum may be deemed sufficient cause to deny the motion").   A memorandum with assertions unsupported by law cannot properly be characterized as a "memorandum of law."

In sum, defendant ACL has failed to sustain its burden of proving futility of these derivative claims.  Having found that none of the claims in the proposed amended portion of the complaint is futile, the Court will grant the Plaintiff's motion to amend [Doc. 21].

**D.  Parties' Joint Motion to Stay Proceedings in Aid of Mediation**

The parties have jointly moved for a one hundred twenty (120) day stay of all pretrial deadlines to enable the parties to "pursue private mediation of the issues raised in this litigation." Doc. 31, at 1.   The parties represent that the case is "scheduled to be mediated with the Honorable Anthony Robaina (Retired) on November 1, 2018, in Hartford, Connecticut."  *Id.*, at 3.

As the parties assert, the district court has the inherent, discretionary authority to issue stays in many circumstances, including when appropriate to permit the parties to participate in mediation." *Id.* (citing *Avdanced Bodycare Solutions, LLC v. Thione Int'l, Inc.*, 524 F.3d 1235, 1241 (11ᵗʰ Cir. 2009)).  *See also Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

In the case at bar, the parties believe that "the granting of the requested stay will serve the interests of both judicial economy, as well as economy of the parties' time and effort."  *Id.*   At this time, the Knapps, ACL, and Otis are all "willing to mediate their disputes without the need for engaging in additional formal discovery."  *Id.*   In particular, the stay will potentially avoid the "distraction and expense of discovery," such as depositions in Oregon, Florida, Maryland and Connecticut.  *Id.*, at 3-4.  Moreover, the private mediation in Connecticut may successfully resolve

the litigated matter so that it may "potentially obviate the need for the resumption of the instant litigation." *Id.*, at 4.

Based on the parties' representations, the Court concurs that the stay is in the interests of justice, preventing further expense to the parties during and leading up to the mediation. It will enable the parties to adequately prepare for, and fully participate in, the scheduled mediation. The Court will extend the deadlines as set forth *infra*.

### III.    CONCLUSION

For the reasons previously discussed,  Plaintiffs' "Motion to Amend the Complaint" [Doc. 21]  is hereby GRANTED in its entirety.   Plaintiffs must file and serve their proposed "Amended Complaint" on or before **October 31, 2018.**  Upon filing, this pleading shall become Plaintiffs' operative complaint against ACL in this action and should be so addressed in the upcoming scheduled mediation on November 1, 2018.

In addition, the parties' "Joint Motion to Stay Proceedings in Aid of Mediation" [Doc. 31] is hereby GRANTED.  As requested by all parties, in recognition that the case may remain pending following the November 1, 2018, mediation, the Court sets the following revised case deadlines. The Defendants must answer or respond to the Amended Complaint on or before **November 30, 2018.**  All discovery shall be completed by **August  28, 2019.**  Dispositive motions must be filed on or before **September 30, 2019**, or within thirty (30) days after the close of discovery, whichever is later. The parties' joint trial memorandum is due on or before **October 29, 2019**, or within thirty (30) days after the Court rules on the last-filed dispositive motion, whichever is later. The case shall be trial ready on **December 2, 2019**, or within thirty (30) days after the joint trial memorandum is filed, whichever is later.

In addition, the parties are hereby ORDERED to file a joint status report within fourteen (14) days after the close of the  November 1, 2018, mediation – on or before **November 15, 2018.**

The foregoing is SO ORDERED.

Signed: New Haven, Connecticut
       October 23, 2018

*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge